IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| George Cleveland,<br><br>                  Plaintiff,<br><br>vs.<br><br>City of Seneca, et al.,<br><br>                  Defendants. | Civil Action No. 8:09-626-HMH-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendants' motion for summary judgment (doc. 48) and the plaintiff's motion for a temporary restraining order ("TRO") (doc. 61). In his amended complaint, the plaintiff, who is proceeding *pro se*, alleges that on March 11, 2008, while the City of Seneca was conducting its "regular city wide elections," he went to one of the voting sites to hand out "fliers," but was asked to leave by the defendants. He claims the defendants' actions violated his federal constitutional rights.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983.

The defendants filed their motion for summary judgment on October 27, 2009. On October 28, 2009, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment procedure and the possible consequences if he failed to respond adequately. On November 30, 2009, the plaintiff filed his response in opposition to the motion for summary judgment.

## **FACTS PRESENTED**

On March 11, 2008, the City of Seneca held a municipal election (Bonnie Moses dep. 8-9). The polling location where this incident took place was the Shaver Complex in the City of Seneca (Moses dep. 9). On the day of the election, the plaintiff, who is not a resident of the City of Seneca,[1] went to the Shaver Complex where he began to pass out literature and talk to the voters in line as well as the candidates about two previous votes of the Seneca City Council that he thought were "politically suspicious" (pl. amended comp. preface and ¶ 1). Bonnie Moses was the Director of the Election for the City of Seneca (Moses dep. 10). Ms. Moses, who was the ultimate authority for any election day issues that arose, had a voter come to her and complain about the plaintiff's actions (Moses dep. 10-12). Ms. Moses explained to the plaintiff that he could not hand out material or talk to the voters within 200 feet of the door, but that he could do so on the street in front of Shaver Complex (Moses dep. 13-14).

The plaintiff then left and went to Walhalla, South Carolina, where he spoke with the Director of the Oconee County Election Commission. According to the plaintiff, the director told him that the papers he was handing out could be a violation of the law, and he would have to be a certain distance from the polling location to distribute the literature. According to the plaintiff, he told the director he would not distribute any more literature. The plaintiff further alleges that the director told him that Ms. Moses could not prevent him from standing outside the building if he was not breaking any laws (pl. resp. m.s.j. 3; amended comp. 3).

The plaintiff returned to the polling location at the Shaver Complex. Ms. Moses testified that she advised him that he still could not harass any voter or candidate

---

[1] In an affidavit submitted in opposition to the plaintiff's motion for a TRO, which will also be considered in this report and recommendation, Edward R. Halbig, the Director of Planning and Development for the City of Seneca, testified that the plaintiff's residence is not in the city limits of Seneca (def. opp. m. for TRO, Halbig aff.).

within 200 feet of the polling location (Moses dep. 14-16). Shortly thereafter, three more voters came in to the Shaver Complex and complained to Ms. Moses about the plaintiff bothering them while they were in line to vote (Moses dep. 17-18). Ms. Moses then asked Rick Lacey, the Director of Seneca's Recreation Department, to call the police and have them ask the plaintiff to leave the polling location. After the police talked to the plaintiff, he left (Moses dep. 18).

At some point prior to having the police summoned to ask the plaintiff to leave the polling location,[2] Ms. Moses showed the plaintiff the poll managers' handbook from the South Carolina Election Commission, which summarizes South Carolina's laws governing elections and outlines her duties (Moses dep. 20-25). Ms. Moses went over the law with the plaintiff and underlined the specific provisions prohibiting what he was doing (Moses dep. 30-32; def. m.s.j., ex. 11).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue

---

[2]According to the plaintiff, the conversation took place on his first visit to the polling place (pl. opp. m.s.j. 3).

of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the non movant and in favor of the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. At 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's positions is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

4

Fed.R.Civ.P. 56(e). Accordingly, when rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at trial on the merits.

## ANALYSIS

The plaintiff claims that his constitutional rights were violated because he was not allowed to pass out political literature and engage voters in political discussion within 200 feet of the entrance to the polling location at Shaver Complex.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech. . . ." In *Thornhill v. Alabama*, 310 U.S. 88, 95 (1940), the Supreme Court of the United States said: "The freedom of speech ... which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State."

South Carolina Code Section 7-25-180 makes it unlawful to distribute any type of campaign literature within 200 feet of any entrance used by voters to enter a polling place. Section 7-25-190 seeks to prevent, among other things, the intimidation or undue influence of any voter. S.C. Code Ann. §§ 7-25-180, -190. In order to enforce the election laws, Section 7-13-140 gives poll managers "full authority to maintain good order at the polls and to enforce obedience to their lawful commands during an election…" and requires that peace officers "answer all such calls for help in preserving the peace as may be made by the managers of election." *Id.* § 7-13-140.

In *Burson v. Freeman*, 504 U.S. 191 (1992), the Supreme Court upheld enforcement of a state statute that created a zone around polling locations in which all political campaigning was precluded. The Tennessee statute before the Court was 100 feet. The Court found no violation of the plaintiff's First or Fourteenth Amendment rights

to freedom of speech. The Court in *Burson* acknowledged that the Tennessee statute amounted to content-based restriction on political speech in public forums and, therefore, had to be subjected to strict scrutiny, which requires that the state show a compelling state interest and that the regulation be narrowly drawn to achieve that end. *Id.* at 198. The Court noted that "this case presents us with a particularly difficult reconciliation: the accommodation of the right to engage in political discourse with the right to vote – a right at the heart of our democracy." *Id.*

The Court concluded that a state "has a compelling interest in protecting voters from confusion and undue influence…and a compelling interest in preserving the integrity of its election process." *Id.* at 199. The Court then traced the historical basis of such laws both in the United States since colonial times and in other democracies. The Court also acknowledged the success that such legislation enjoyed in securing a democratic process. *Id* at 200-205. The Court noted that as of 1992 all 50 states and numerous other western democracies had "settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments. We find that this widespread and time tested consensus demonstrates that some restricted zone is necessary in order to serve the state's compelling interest in preventing voter intimidation and election fraud." *Id.* at 206.

The Court, having held that a restricted zone around the voting area is necessary to secure the state's compelling interest, dealt with the geographic size of that zone. The plaintiff in the *Burson* case argued that a 100 foot boundary was not narrow enough. *Id.* at 208. The Court disagreed. The Court held that the state was not required to prove that a "one hundred foot boundary is perfectly tailored to deal with voter intimidation and election fraud" and that the question of whether the 100 foot boundary line could be somewhat tighter was not a question of "constitutional dimension." *Id.* at 209-10. The Tennessee Supreme Court, which the *Burson* Court reversed, had found that the

6

boundaries should be reduced to 25 feet. The Supreme Court concluded that the difference between 100 feet and 25 feet was a "difference only in degree, not a less restrictive alternative in kind." *Id.* at 210. The Court summarized as follows:

> Here, the State, as recognized administrator of elections, has asserted that the exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud. A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right. Given the conflict between these two rights, we hold that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise.

*Id.* at 211.

Similarly, here, South Carolina's restricted zone of 200 feet does not constitute an unconstitutional compromise between the right to free speech and "the right to cast a ballot in an election free from the taint of intimidation and fraud." The plaintiff has no evidence to dispute the defendants' evidence that several voters complained about his actions at the polling location. Ms. Moses acted well within her authority as poll manager to maintain good order at the polls in calling the police to ask the plaintiff to leave. Further, the police officers abided by South Carolina Code Section 7-13-140 in answering her "call[] for help in preserving the peace." The plaintiff has failed to show that any of the defendants violated his constitutional rights.

The defendants also argue that, to the extent the plaintiff raises his claims against them in their individual capacities, they are entitled to qualified immunity. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the

7

alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998). Here, no constitutional right of the plaintiff has been violated. Furthermore, even if a constitutional right was violated, the right was certainly not clearly established based upon the ruling in *Burson* in which the Supreme Court refused to set an arbitrary limit on such a restricted zone.

To the extent the plaintiff alleges any claim under state law, South Carolina Code Section 7-25-220 provides that a poll worker acting in furtherance of the holding of an election "shall be immune from personal civil liability for any act or omission when the act or omission is done or made in good faith and does not constitute gross negligence, recklessness, willfulness, or wantonness." The plaintiff has failed to show evidence of "gross negligence, recklessness, willfulness, or wantonness" on behalf of the defendants.

On January 12, 2010, the plaintiff filed a motion for a TRO in which he asks that the court prevent Ms. Moses from participating in all election-related work on the municipal election day, March 9, 2010 (doc. 61). As noted by the defendants, the plaintiff insinuates in his motion that his right to vote has been threatened. However, as the plaintiff

8

is not a resident of the City of Seneca, he could not have voted in the election on March 11, 2008, and he is not eligible to vote in the upcoming election on March 9, 2010.

To obtain a preliminary injunction, the plaintiff must demonstrate "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council. Inc.*, 129 S. Ct. 365, 374 (2008); *Real Truth About Obama, Inc. v. Federal Election Comn.*, No. 08-1977, 2009 WL 2408735, *4 (4th Cir. Aug. 5, 2009) (finding that "because of its differences with the *Winter* test, the *Blackwelder* balance-of-hardship test may no longer be applied in granting or denying preliminary injunctions in the Fourth Circuit"); *Scott v. Padula*, C.A. No. 0:08-3240-HFF-PJG, 2009 WL 2579464, *1 (D.S.C. August 18, 2009). *See Neiswender v. Bank of America*, No. 09-2595, 2009 WL 1834406, * 1 (N.D. Cal. June 23, 2009) ("A request for a temporary restraining order is governed by the same general standards that govern the issuance of a preliminary injunction.") (citations omitted). The plaintiff has failed to make the required showing.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, it is recommended that the defendants' motion for summary judgment (doc. 48) be granted. Furthermore, it is recommended that the plaintiff's motion for TRO (doc. 61) be denied.

s/William M. Catoe
United States Magistrate Judge

February 25, 2010
Greenville, South Carolina

9